v. McGhee v. Martaschello. So Mr. Fetter, am I pronouncing that right? Yes, Your Honor. You have reserved two minutes for a vote. So if we'll just give your adversary a second to settle. All right, you may proceed. May it please the court, my name is Daniel Fetter, and I'm here on behalf of Petitioner Darren McGhee. Mr. McGhee was convicted after a trial infected by three interlocking errors, each of which served to protect and bolster the credibility of the only eyewitness to testify at trial, Miss Nicole Davis. I'll talk about each of these three errors in turn. Well, I mean, I just want to push back a minute. The only eyewitness, I guess, to the actual shooting, but there's also a witness who was involved in procuring the services of your client to do the shooting in the first place, right? Yes, that's correct. Mr. Reynolds, the cooperator, testified in accordance with his cooperation deal that Mr. McGhee was involved in the shooting, but he did not witness the shooting and could not be referred to as an eyewitness. Reynolds' wife was also there when your client and her husband planned the murder, as she described it, in her apartment, right? I believe Miss Tewitt's testimony would be more accurately characterized as describing Mr. McGhee as being present in the apartment, which Mr. McGhee denied. Don't believe her testimony discussed them planning it rather than them being in the apartment, leaving the apartment on several occasions, coming back to the apartment, and looking out the window. A review of the trial appendix on that matter shows that she did not speak to what the defendant or her husband actually spoke about or spoke to. But regardless, Miss Tewitt also was not an eyewitness to the shooting. The only eyewitness was Miss Nicole Davis. The people first, the first error is that the people suppressed for a period of years the existence of a second eyewitness, as well as a statement taken from that eyewitness. The first two elements of Brady are not contested here. It is clear that this evidence was favorable to Mr. McGhee, and it is clear that this was suppressed for years by the trial attorneys, the DAs, who in fact attended the interview that was memorialized in that statement. The statement was exculpatory, and that is the primary reason that it was material, because it suggested an alternate motive for the shooting, which the evidence did not attach in any way to Mr. McGhee, and therefore suggested an alternate shooter. And that was an entirely different theory of motive for the shooting than what the prosecution presented at trial. The statement also would have impeached Miss Nicole Davis, in addition to providing a different shooter than the one that she identified in a variety of manners regarding her description of the events of that day, as well as her description of what the shooter looked like. And finally, it called into question the police's investigation, because the police and the people did not follow up on the multiple leads presented in Individual A's statement. And it appears from the statement that they did not even ask Individual A about the individual that they already had in custody, or ask if he was the shooter, or show a picture. There is no indication in the record that they took any of those steps. All of that is evidence that should have been presented to the jury, and Mr. McGhee was deprived of that opportunity by the suppression of Individual A's existence and of the statement he provided. Second, the people further bolstered Miss Davis' testimony by introducing three out-of-court identifications while watching a surveillance tape of a sidewalk near the scene of the shooting in a photo array and in a lineup that occurred six weeks later. Each of these three identifications was irreparably tainted by the detective's instruction to watch the video for someone wearing all brown. I'm confused, and maybe I'm misremembering the facts. I thought the photo array wasn't actually admitted at trial. Am I wrong about that? It was actually admitted as evidence at trial? I am not sure if the photo array itself was introduced at trial, but there was testimony regarding each of Miss Davis' three prior identifications. I understand, okay. Each of those were tainted by the detective's suggestion to watch the video for somebody wearing all brown. But Miss Davis had already identified the shooter as somebody wearing all brown or beige. Miss Davis testified at trial that she had given that description. That was the vague description she gave in her apartment. Detective Morbin testified at the Wade hearing and at trial that that came from 911 calls and run reports, and he also testified at trial that he could not recall if Miss Davis provided that all beige description until after watching the video. So there is, in fact, a dispute regarding that question, and it is entirely unsure whether or not Miss Davis provided any description of the shooter until after spotting the individual wearing all brown on the video at Detective Morbin's suggestion. If it turns out that at the suppression hearing there was no evidence that she had identified him as wearing brown beforehand, but at trial she testified that she did identify him as wearing brown, or beige, I guess, even prior to any of this photo array and identification procedures. Given our standard of review, how do we surmount that, right? We're looking, I mean, under understanding of review, we're looking at the evidence most favorable to the government from the perspective of the harmlessness, and then we've got the added layers of the ADEPA. How would we surmount that, or is it the questionability of that testimony that you rely on? Well, I think the question here is whether or not it was appropriate for the state court to determine that Miss Davis' identifications were independently reliable. And the state court made that determination that it was upheld on appeal on the basis of the Wade hearing, where Miss Davis' later claim at trial that she had made that statement while on the balcony of her apartment was not at issue. But even putting that aside, and putting aside the dispute of it, I would submit that even if it were uncontested and undisputed that she made that statement originally, it pales in comparison to the cases that the government cites, in which a prior identification showed that the later identification should be relied upon. For instance, in the Rahim V. Kelly case, we have descriptions that predate the suggestion from the police, was dressed very neat, brown skin, had a black leather coat and a cap, about 5'8", 165 or 170 pounds, perhaps 27 to 30 years old, did not have a mustache or long sideburns. Miss Davis suggested that, at best, Miss Davis' suggestion was that the shooter was wearing all beige. And not only is that the description she may have given while at her apartment with Detective Morbin, there's no indication that at the police station later, before viewing the video, she provided any more detailed description. But that's the crux of the, I mean, the whole reason that that video was unduly suggestive was because the officer said, look for who's wearing beige, right? So that was the, that was the crux of the suggestibility. It wasn't like some other thing that created the problem. And if it turns out that she had already committed to the notion that this person was wearing beige prior to that suggestion, I'm just trying to figure out how that, what we do with that. I think even in that context, although, again, I would just like to reiterate that it's not clear that the record supports that exact sequence of events. But even in that context, the reminder to her before viewing this video of what she had spoken about earlier, rather than relying on her apparently confirmed she had seen this individual multiple times before, was able, as the people point out, to describe him in detail at trial, despite never having done that prior to viewing the video, to remind her of the one and only comment she may have provided to police, I would submit, was still suggestive and inappropriate. That converted, as in the Solomon case, her identification from one that was tentative to certain, and then six weeks later at the lineup, the Detective Morbin reinforced that by reminding her to keep an eye out for somebody she had noticed in the photo array, linking it to the earlier issues. So introducing all three of those, which the people did, and reemphasized in their closing arguments, walking the jury through each one of the earlier identifications, and telling the jury that this made Ms. Davis more credible, certainly had an impact and undermines any confidence in the verdict. I'd like to briefly return to that closing argument, because I think it shows the materiality. Each one of the points that we talk about here that was created by the government's errors and the violations of Mr. McGee's rights were emphasized in the opening 15 pages of the people's closing argument. I submit that that shows even the people felt these errors were material, and on that basis, Mr. McGee's petition should be granted. Thank you, Your Honor. All right, thank you, Mr. Fetter. You've reserved two minutes for rebuttal. We'll now hear from Mr. Michaels. Thank you, Your Honors. And may it please the Court, Alexander Michaels from the New York County District Attorney's Office on behalf of respondents. To quickly touch on the substance of Corrine Tewitt's testimony, I just want to clarify the record a bit. Tewitt testified about how her husband and petitioner discussed a gun that her husband was cleaning at that time, and petitioner described how the husband needed to clean the gun in order to avoid leaving any evidence behind on it. Tewitt also testified about seeing petitioner leave her house and return 15 minutes later wearing gloves, all of a sudden, kitchen gloves as she described them, while also saying it was the wrong person. Tewitt went on to testify that she had to give petitioner her phone, loan petitioner her phone, which of course corroborated the extensive evidence of the conspiracy that was going on here. And Tewitt also testified about how Lily, another conspirator in this murder, came to retrieve the gun shortly before the shooting. Now more broadly, I just want to stress that petitioner needs to show that every fair-minded jurist would agree that the state courts violated clearly established federal law here. And petitioner can't make that showing because the New York Court of Appeals reasonably decided that petitioner's Brady claim did not satisfy the materiality requirement, and then the appellate division reasonably decided his suppression claim. The Court of Appeals decision was supported by three distinct considerations. First, the strength of the people's evidence, including the extensive evidence of the conspiracy to kill Phillips, none of which would have been undermined by the arrestee's statement in this case. Second, the minimal impeachment value of the arrestee's statement here. And third, the speculative nature of petitioner's claims of exculpatory value, especially in light of everything else we know about this case. Petitioner frames this as a one-witness case, but it was really so much more than that. There was powerful evidence from a wide variety of sources about the entirety of the conspiracy to kill Phillips. Can I just go back though specifically to that? I was waiting to hear whether you were gonna talk about the identification tonight. I wanna make sure I understand your position on that because there's no dispute. I mean, the New York Court held that the initial video identification was unduly suggestive. Correct, Your Honor, yes. Once the court does that, and once we recognize that it was unduly suggestive, given everything science now tells us about photo identifications, how can it be that the validity of that photo identification can, or that identification can be salvaged by looking at a picture 21 hours later and picking up the same person that you've just looked at on a video and committed to in a suggestive context? Well, the biggest factors outlined by the Supreme Court lay out how to assess the reliability of identification, even if it was an unduly suggested identification in the first instance. And the assessment of the reliability, we walked through it in our brief. There are a number of factors that really strongly support the reliability of Davis's identification here. For one, as Your Honor referred to, the trial testimony that came from Davis, who was not a witness at the suppression hearing, but who was present at the trial, of course, she was very clear and very specific about how she had initially provided this vague description of defendant's attire, of petitioner's attire, that is. And she had deliberately, she'd been deliberately vague about it because she was still in a public space in the Polo Grounds houses, and she did not want to be perceived as someone who was cooperating unduly with police. So then she explained that she gathered more courage when she was in a more private setting. She knew exactly who this was, and she was more comfortable sharing her identification. And the reliability of her identification was also very thoroughly established by the fact that she was able to identify very particular changes in the petitioner's appearance between the time that she had first seen him and the subsequent times that she had seen him. So what you're doing, and this sort of goes to the conversation I was having with your colleague, is it's not that the subsequent identifications are what sort of salvaged or rendered harmless, it really is her testimony at trial that satisfies us that although it was unduly suggestive, she actually already had in mind the beige outfit. So then I'm trying to figure, and I understand that rationale, I'm trying to figure out procedurally whether we're evaluating the state court's ruling on the suppression motion in the universe of evidence that the state court had in front of it at the suppression motion, or whether we're evaluating it with the benefit of hindsight, or what's the frame that we use for that? So the last reasoned decision of the state court on this issue is the appellate division's decision after the remand from the Court of Appeals. So that's the decision that this court needs to apply the habeas standard of review to. And the appellate division's decision was that, yes, the initial video identification should have been kept out. The photo-array identification, just to be clear, that did not make it into the record at trial in any way, as far as I know. There wasn't testimony decision? There was not testimony about the photo-array identification itself. That's because at the time, New York law did not permit such testimony. I think now the law has been changed so that photo-arrays are favored over lineup identifications. I realize this is a quirky part of the record, but my understanding is that the photo-array was not itself admitted or referred to during the trial. So yeah, the appellate division held that that was an unduly suggestive video identification, and that it should have been suppressed, but that its admission was harmless. And the appellate division went on to hold that the subsequent identifications were reliable because they weren't irreparably tainted. Right, but that's the question I'm asking. I don't recall that the court said we know that they weren't irreparably tainted because the witness had previously committed to this description of Kressling and Brown. I just see the court saying it was essentially resurrected, untainted by virtue of a subsequent identification. And while the appellate division did not get into the specifics of the findings that underline that conclusion, it's very clear from this court's precedent, in federal cases as a matter of fact, that it is appropriate for courts assessing the reliability of an identification to rely on the trial record. We specifically have a site relating to that in our brief. I don't have it handy at the moment, but this court has made clear that assessing the reliability of an identification despite or notwithstanding previous undue suggestion is something that can be done not based solely on the suppression record, but also based on the trial record. Unless the court has any other questions, people ask that the court affirm. All right, thank you very much. Mr. Michaels, we'll now hear from Mr. Fetter for two minutes of rebuttal. Thank you, Your Honor. I'd like to briefly respond on the identification points and then talk a little bit about the Brady violation. First, I want to acknowledge I misspoke in discussing the photo array. In closing arguments, the people emphasized that Ms. Davis recognized the shooter four different times. The first of those four, they say, was at the shooting itself, and the photo array was not raised, but both the video and the lineup identification were emphasized in closing. However, what Ms. Davis didn't do, despite being in the privacy and the safe area where she would not be accused of cooperating with police at the police station, is offer her apparently clearly remembered exact description of Mr. McGee before viewing the video. It was only after viewing the video and after receiving the suggestion to keep an eye out for an individual wearing all brown that she remembered that she had seen Mr. McGee before and could come up with the detailed description that she provided at trial that the people just relied upon. I submit that that detail that she did not offer to the police before the suggestion actually cuts against the people's argument, not in favor of it. Briefly on the Brady issue, I would just like to note that Ms. Tewitt also was not an eyewitness to the shooting. The people relied heavily on the eyewitness and the appellate division found in favor on the Brady issue specifically because it would undermine the conspiracy provided by Mr. Reynolds as well as impeach Ms. Davis. It would undermine the conspiracy because this was the only evidence Mr. McGee could have used and the investigation that would have developed that evidence to point to an alternate shooting. As the people emphasized in their brief, even Mr. McGee testified that he felt that Mr. Reynolds had committed the shooting, which corroborated Mr. Reynolds' testimony and significantly undermined the defense. Had individual A's existence and statement been disclosed and the non-speculative, very concrete steps that could have been followed up with on that statement, Mr. McGee might not have even needed to testify in his defense. But wait, there was another witness who said that the person who did the shooting was seen in the witness's building weeks after your client had been arrested, right? Yes, Your Honor, I believe that was- So that was enough to put the defense on notice that there was another shooter. I believe that Ms. Rodriguez was the one being referred to there. I apologize if it was Ms. Santiago. She did not see the shooting. She saw an individual run past her away from the scene, which was heavily emphasized by the people in- But I mean, it supports the theory that you're saying now was unknown to the defense, right? I believe that being unable to point to an alternate shooter as opposed to Mr. Reynolds' testimony, despite having that impeachment witness, that impeachment testimony was so uncertain and not from an eyewitness, as the people emphasized to the jury, that Mr. McGee was forced to corroborate Mr. Reynolds' testimony. The significance of that cannot be overstated. By helping out of the prosecution's theory of the case, Mr. McGee was forced to testify in his own defense in a manner that the people now emphasize significantly undermined his defense. This notion that Individual A sort of supports an alternate shooter theory, I'm struggling with that a little bit because it strikes me that the most striking aspect of his identification is that he described somebody wearing all beige and a hat, which seems very corroborative of the identification that was made here. How is it that, is it this sort of afterthought of like, oh, the word on the street, is there this other thing going on? Is that the piece that you're most concerned about, or is it his description of the shooting? I think it's both, and I'll address each of those in turn. First of all, I'm glad you mentioned the clothing, because the hat was the difference between Individual A's description of a bucket hat and the beret-style cap that was raised at trial. This is a difference worth impeaching a witness over. But you already, I mean, the witness already was impeached on that. There was a witness called who said it was a different hat, right? I believe, once again, this is Ms. Rodriguez, who testified that it was a beret-style cap, which was consistent, as the people emphasized, with Ms. Davis' identification of a cap with a brim, which is different from the bucket hat. There was also the difference between Individual A suggesting there was a jacket, which Ms. Davis had no recollection of. All of these things would have helped impeach her description. On top of that, there was the impeachment of the description of the events of that day, which was highly significant, the difference between a conversation between the shooter and the victim. And I'll remind you that Mr. Reynolds testified he had to point out who the victim was to Mr. McGee because Mr. McGee had never seen or met him before. There's the description of a lengthy chase during which Individual A lost sight of the two individuals, and the description of a flight from the scene while Ms. Davis' description of Mr. McGee supposedly calmly walking away was significant to the prosecution in showing Mr. McGee's guilt. But then finally, I want to speak just briefly, I know I'm over time here, about the alternate motive which was described, because this is where the people have tried to insist that this was speculative. The cases in which that type of evidence, pressed evidence, was described as speculative had no further leads. There was one case, this was the, excuse me, I believe it was the Irvin case, could be getting that name wrong. Yes, Irvin v. Smith, in which it was an anonymous tip line that contained no names of witnesses or anybody else to identify. Individual A's statement, in addition to describing a discrete set of people, Social Security recipients, who were implicated by the alternate motive, also named two other individuals who were eyewitnesses and could also speak to it. And as I mentioned before, they did not get a description, they did not show a picture of Mr. McGee who was already in custody, it appears. Or they didn't record individual A's answer to that question if they asked it. All of those things are concrete, significant steps that could lead to a reasonable possibility of admissible evidence, which is the standard here. That's not speculative in any event. So- Well, but you seem to be speculating about what these witnesses would say. Isn't that what makes it speculative? I think that- You're saying it's not speculative that investigative steps could have been taken. What's speculative is whether investigative steps would have made any difference. I don't think I'm speaking to speculation as to what those witnesses would say. The standard here is a reasonable possibility of admissible evidence. And I submit that speaking to those other individuals, speaking to the potential victims of the victim's robbery, the social security recipients, people who may be able to speak to this, could lead to admissible evidence, reasonably could lead to admissible evidence. And that's all that Mr. McGee needs to show here. So for these reasons, unless there are any other questions, I submit that Mr. McGee's petition should be granted. Thank you, your honors. Thank you, Mr. Spenner. Thank you, Mr. Michaels. We will reserve decision. We have one other case.